

1  GLANCY BINKOW & GOLDBERG LLP
   LIONEL Z. GLANCY (#134180)
2  MICHAEL GOLDBERG (#188669)
3  CASEY E. SADLER (#274241)
   1801 Avenue of the Stars, Suite 311
4  Los Angeles, California 90067
5  Telephone:  (310) 201-9150
   Facsimile:   (310) 201-9160
6

7  [*Additional counsel on signature page*]

8
   Attorneys for Plaintiff Jeff Feyko
9

10              UNITED STATES DISTRICT COURT

11            CENTRAL DISTRICT OF CALIFORNIA

12

13  JEFF FEYKO, Individually and on        Case No. _____
    Behalf of All Others Similarly
14  Situated,                              CLASS ACTION

15                        Plaintiff,       **COMPLAINT FOR VIOLATIONS
16                                         OF THE FEDERAL SECURITIES
17            v.                           LAWS**

18
    YUHE INTERNATIONAL, INC.,
19  GAO ZHENTAO, and HU GANG,              **DEMAND FOR JURY TRIAL**

20
                          Defendants.
21

22

23

24

25

26

27

28

    COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiff Jeff Feyko ("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Yuhe International, Inc. ("Yuhe" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Yuhe; and (c) review of other publicly available information concerning Yuhe.

## NATURE OF THE ACTION AND OVERVIEW

1.     This is a class action on behalf of purchasers of Yuhe's securities between December 31, 2009, and June 17, 2011, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Yuhe engages in the supply of day-old chickens raised for meat production or broilers in the People's Republic of China. The Company purchases breeding stocks from primary breeder farms, raises them for hatching eggs, and sells live day-old broilers.

3.     On or about June 16, 2011, a research report was published on the internet alleging that the Company had misrepresented the details surrounding its

acquisition of thirteen breeder farms from Weifang Dajiang Corporation ("Weifang") in 2009 and called into question the accuracy of the financial statements Yuhe had filed with the SEC during the Company's 2009 and 2010 fiscal years.  Specifically, the report alleged that Yuhe never reached or executed an agreement with Weifang and that the $12.1 million deposit allegedly paid to acquire the farms may have been misappropriated.

4.     On this news, the Company's shares declined $2.12 per share, or nearly 52%, to close on June 16, 2011, at $1.96 per share, on unusually heavy trading volume.

5.     On June 17, 2011, Yuhe hosted a conference call during which Company executives denied that it had misled investors, but admitted that the Company had failed to disclose that the acquisition for the thirteen breeder farms had never gone through.  The Company further disclosed that when Weifang had decided to not execute the transaction, Yuhe's chairman and Chief Executive Officer ("CEO"), Gao Zhentao ("Gao"), decided to put the $12 million deposit for the transaction into a private bank account.  The Company claimed that these funds that were kept in Gao's personal account were subsequently used to purchase eleven different farms from a separate seller.

6.     On this news, the Company's shares declined $0.75 per share, or more than 38%, on June 17, 2011, to $1.21 per share, on unusually heavy trading

volume, before trading of the Company's shares was subsequently halted during that day.

7.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that the Company had failed to execute the purchase agreement with Weifang; (2) that the Company had not completely paid both the initial amount and remaining balance, totaling more than $12 million, of the agreement's total consideration to Weifang; (3) that the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's statements were materially false and misleading at all relevant times.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11.     Venue is proper in this Judicial District pursuant to §28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.     Plaintiff Jeff Feyko, as set forth in the accompanying certification, incorporated by reference herein, purchased Yuhe securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant Yuhe is a Nevada corporation with its principle executive offices located at 301 Hailong Street, Hanting District, Weifang, Shandong Province, the People's Republic of China.

15.     Defendant Gao was, at all relevant times, the CEO of Yuhe.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- 4 -

16.    Defendant Hu Gang ("Hu") was, at all relevant times, Chief Financial Officer ("CFO") of Yuhe.

17.    Defendants Gao and Hu are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Yuhe's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS
### Background

18.    Yuhe engages in the supply of day-old chickens raised for meat production or broilers in the People's Republic of China. The Company

purchases breeding stocks from primary breeder farms, raises them for hatching

eggs, and sells live day-old broilers.

## Materially False and Misleading
## Statements Issued During the Class Period

19.    The Class Period begins on December 31, 2009.  On this day, the

Company filed a Form 8-K with the SEC, which was signed by Defendant Gao.

Therein, the Company, in relevant part, stated:

> On December 24, 2009, Weifang Yuhe Poultry Co. Ltd. ("Weifang
> Yuhe"), a wholly-owned subsidiary of Yuhe International, Inc. (the
> Company) entered into a transfer agreement (the "First Agreement")
> with Weifangshi Dajiang Qiye Group Co. Ltd. ("Dajiang"), a
> company established in the People's Republic of China ("PRC") and
> unaffiliated with the Company.

> Under the First Agreement, Dajiang agreed to transfer to Weifang
> Yuhe a total of thirteen breeder farms (the "Farms") with a total area
> of 560 mu (approximately 37 hectares) at a total consideration of
> RMB 103,870,000.  The transfer consideration is to be settled in two
> installments with the first installment in the amount of RMB
> 83,000,000 being payable on or before December 31, 2009 and the
> balance being payable within two months following completion of the
> transfer.  Payment of the first installment has been made.  The Farms
> are located in the surrounding areas of Linghe Town and Danshan
> Town of Anqiu City, the PRC.  The lands on which the Farms are
> situated have a remaining term of 36 years and Weifang Yuhe will
> enjoy a right to use the relevant lands for 36 years.  The transfer of the
> Farms will be completed in or around the beginning of March 2010.

> On December 26, 2009, Weifang Yuhe entered into a land transfer
> agreement (the "Second Agreement") with Yejiazhuangzi Villagers
> Commission (the "Commission"), a party unaffiliated with the
> Company.

Under the Second Agreement, the Commission agreed to transfer to Weifang Yuhe a land ("Land") with an area of 80 mu (approximately 5.3 hectares), together with the buildings and facilities thereon for Weifang Yuhe to construct breeder farms. The Land is located in the south of Yejiazhuangzi Village, PRC. The term of the right to use the Land is 50 years commencing on December 26, 2009 until December 25, 2058. The consideration for the transfer of the Land is RMB 20,000,000, which has already been settled

20.    On January 4, 2011, the Company issued a press release entitled, "Yuhe International, Inc. Increases Number of Breeder Farms to 27." Therein, the Company, in relevant part, stated:

Weifang, Shandong province, P.R.C. January 4, 2010 – Yuhe International, Inc. (NASDAQ: YUII) ("Yuhe" or "the Company"), a leading supplier of day-old chickens raised for meat production, or broilers, in the People's Republic of China ("PRC"), today announced that the Company had recently entered into an agreement to purchase 13 breeder farms from Weifang Dajiang Corporation. The Company also entered into an agreement to purchase land use rights for a 5.3-hectare (80 mu) parcel of land in Weifang, Shandong Province, where the Company intends to build a new breeder farm.

The aggregate purchase price for the 13 breeder farms is RMB103.87 million (approximately $15.2 million). Pursuant to the agreement, Yuhe already paid 80% of the purchase price on or before December 31, 2009 and will pay the remaining balance within two months after formal delivery of the farms, expected in early March 2010. Built from 1996 to 1999, the farms cover a total area of 37 hectares (560 mu), for which Yuhe acquired all the ground buildings as well as the land use rights for 36 years. The purchase price also includes in-house breeding facilities which supply feed, water and air to the parent breeders. The breeder farms are in good condition and require only RMB17 million (approximately $2.5 million) for renovation. These farms will add 600,000 sets of parent breeders for Yuhe by the third quarter of 2010.

"By purchasing these thirteen breeder farms, we are able to quickly increase our production capacity of day-old broilers," said Mr. Zhentao Gao, CEO of Yuhe. "We will leverage our expertise in modern chicken breeding, disease prevention and animal husbandry science to capture the tremendous market potential for poultry in China."

In a separate agreement, the Company purchased the land use rights for 50 years of a 5.3 hectare (80 mu) parcel of land for RMB18.0 million (approximately US$2.64 million), which was paid at the end of 2009. Yuhe also paid an additional RMB2.0 million (approximately US$0.29 million) for a building and other facilities within the area. The construction of this new breeder farm will start in February 2010 and finish by the second quarter of 2010. It will add 120,000 sets of parent breeders for Yuhe. The total capital expenditure for construction and equipment will be around RMB17 million (US$ 2.5 million).

"Our solid balance sheet and strong operating cash flow will support our capital expenditures. Furthermore, the newly acquired land use rights provide us with additional financial flexibility as they can be used as collateral for long term bank loans," concluded Mr. Gao.

21. On March 8, 2010, the Company filed an 8-K with the SEC, which included a March 2010 investor presentation that contained a slide entitled, "New Breeder Farm Acquisitions." Therein, the Company, in relevant part, stated:

Impact of the acquisitions

- Expands capacity by 60%

- Lowers depreciation cost: the bid price is 15%-20% lower than own construction cost

- Payback period is expected to be 2 - 3 years

- New relationships with Dajiang's distributors

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- 8 -

- Gain a new group of skilled employees with approximately 10 years of breeding experience

- Cash flow in Yuhe could support the on-going business operations after Dajiang [Weifang] Acquisition

- The company continues to search for similar acquisition opportunities in Shandong Province

22.     On March 31, 2010, the Company issued a press release entitled, "Yuhe International Inc. Announces Fourth Quarter and Fiscal Year 2009 Results, Provides 2010 Guidance."   Therein, the Company, in relevant part, stated:

> · 2009 revenue rises 31% to $47.2 million, net income grows 22% to $12.8 million, or $0.81 per fully diluted share
>
> · 2010 guidance for net income of approximately $17 million Weifang, Shandong Province, P.R.C. March 31, 2010 –Yuhe International, Inc.
>
> (NASDAQ: YUII) ("Yuhe" or "the Company"), a leading supplier of day-old chickens raised for meat production, or broilers, in the People's Republic of China ("PRC"), today announced financial results for the fourth quarter and fiscal year ended December 31, 2009.
>
> Full Year 2009 Highlights
>
> · Net revenue was $47.2 million, up 30.8% from 2008 pro forma net revenue Gross profit was $16.7 million, up 26.8% from 2008 pro forma gross profit
>
> · Operating income was $13.3 million, up 19.9% from 2008 pro forma operating income

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 9 -

· Net income reached $12.8 million, up 19.9% from 2008 pro forma net income

· Diluted earnings per share were $0.81, up from pro forma diluted earnings per share of $0.74 in 2008

· Completed the construction of 14th new breeder farm in December 2009

· Entered into a $15.2 million agreement to purchase 13 breeder farms from Weifang Dajiang Corporation

· Entered into an agreement to purchase land use rights for a 5.3-hectare (80 mu) parcel of land at a cost of approximately $2.6 million PDF

23.    On March 31, 2010, Yuhe filed its Annual Report on Form 10-K with the SEC for the 2009 fiscal year.  The Company's Form 10-K was signed by Defendants Gao and Hu, and reaffirmed the Company's financial results announced that same day.   The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants Gao and Hu, who certified:

1. I have reviewed this annual report on Form 10-K of Yuhe International, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

- 10 -

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to the Company by others within those entities, particularly during the period in which this report is being prepared;

b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.

24.    Moreover, the Company's Annual Report filed with the SEC on March 31, 2010, in relevant part, stated:

Currently, the Company has 28 breeder farms with 15 in operation and two hatcheries with a total annual capacity of 1.2 million sets of breeders and 120 hatchers through its wholly-owned subsidiary, Weifang Yuhe Poultry Co. Ltd., "PRC Yuhe". The remaining 13 breeder farms were purchased in December 2009 and are undergoing renovations. They are expected to be in full operation by the third quarter of 2010.

\*       \*       \*

PRC Yuhe has recently purchased in December 2009 13 breeder farms covering a total area of 37 hectares (560 mu) and acquired all the ground buildings thereon and the land use rights thereto for 36 years.  It already paid 80% of the purchase price on or before December 31, 2009 and will pay the remaining balance within 2 months after formal delivery of these farms, which is expected to take place in March 2010.  It will apply to obtain the relevant Land Use Right Certificates and the Building Ownership Certificate for these 13 breeder farms in due course.

As to the other 13 breeder farms, Yuhe PRC does not directly own land or land use rights for these breeder farms, but leases approximately 374,000 square meters of land to house these farms. PRC Yuhe has built on the leased land various buildings to house its breeder farms. These buildings are considered temporary structures. Because PRC Yuhe does not own these lands for these 13 breeder farms, it did not apply for and was not granted the Land Use Right

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 12 -

Certificate and Building Ownership Certificate for these breeder farm lands it leased and the buildings it has erected on the leased land. However, PRC Yuhe has the right to use the breeder farm lands as specified in the Lease Agreement, which typically last about twenty to forty years. During the term of the relevant Lease Agreement, all the buildings and fixtures erected by PRC Yuhe on the leased breeder farm lands are protected by PRC law and PRC Yuhe can freely dispose of them.

\*        \*        \*

Acquisition of 13 breeder farms

On December 24, 2009, PRC Yuhe entered into an agreement to purchase thirteen breeder farms at a total consideration of RMB103,870,000, approximately equivalent to $15,191,891. As of December 31, 2009, PRC Yuhe has paid 80% of the total consideration, or RMB 83,000,000, approximately equivalent to $12,139,472. The remaining balance will be paid within two months after formal delivery of the farms, expected in early Oct 2010. The farms cover a total area of 37 hectares (560 mu), for which PRC Yuhe acquired all the ground buildings as well as the land use rights for 36 years. The purchase price also includes in-house breeding facilities which supply feed, water and air to the parent breeders. PRC Yuhe expects to spend RMB17,000,000, approximately equivalent to $2,490,000 for renovation.

25.    Additionally, the Company attributed and recorded a $12,139,473 cash outflow, posted to the account titled long term assets, "Deposit paid for the purchase of buildings," in its Annual Report filed with the SEC on March 31, 2010.   This amount represents the first installment of the purported purchase agreement between Yuhe and Waifang.

26.   On May 14, 2011, the Company issued a press release entitled, "Yuhe International, Inc. Announces First Quarter 2010 Results."   Therein, the Company, in relevant part, stated:

First Quarter 2010 Highlights and Recent Events

· Net revenue increased 7.7% to $11.8 million year over year

· Sales volume grew 11% to 25.6 million birds year over year

· Gross profit was $3.9 million with gross margin of 33.2%

· Operating income was $3.0 million, down 7.9% year over year

· Net income increased 0.4% to $2.9 million, or $0.18 per fully diluted share

27.   On May 14, 2010, Yuhe filed its Quarterly Report on Form 10-Q with the SEC for the 2010 fiscal first quarter.   The Company's Form 10-Q was signed by Defendants Gao and Hu, and reaffirmed the Company's financial results announced that same day.   The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Gao and Hu, substantially similar to the certifications contained in ¶23, *supra*.

28.   On August 13, 2010, Yuhe filed its Quarterly Report on Form 10-Q with the SEC for the 2010 fiscal second quarter.   The Company's Form 10-Q was signed by Defendants Gao and Hu, and announced the Company's financial results for the quarter.   The Company's Form 10-Q also contained Sarbanes-

Oxley required certifications, signed by Defendants Gao and Hu, substantially similar to the certifications contained in ¶23, *supra*.

29.    On August 16, 2010, the Company issued a press release entitled, "Yuhe International, Inc. Announces Record Second Quarter 2010 Results." Therein, the Company, in relevant part, stated:

> ~Revenues Increased 26.9% to $12.5 Million~
> ~Net Income and Diluted EPS Increased 46.1% and 46.2%, Respectively~
>
> Weifang, Shandong Province, P.R.C. August 16, 2010 –Yuhe International, Inc. (NASDAQ: YUII) ("Yuhe" or "the Company"), a leading supplier of day-old chickens raised for meat production, or broilers, in the People's Republic of China ("PRC"), today announced financial results for the quarter ended June 30, 2010.
>
> Second Quarter 2010 Highlights
>
> · Net revenue increased 26.9% to $12.5 million year-over-year
>
> · Sales volume increased 34.4% to 34.6 million birds
>
> · Gross profit increased 47.1% to $4.1 million
>
> · Gross margin increased 450 basis points to 33.0%
>
> · Operating income increased 51.1% to $3.1 million
>
> · Operating margin increased 400 basis points to 24.9%
>
> · Net income increased 46.1% to $3.1 million
>
> · Diluted EPS increased 46.2% to $0.19

*    *    *

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 15 -

Case 2:11-cv-05511-DDP-PJW    Document 1    Filed 07/01/11    Page 17 of 50    Page ID
#:18

As of August 13, 2010, six of the thirteen breeder farms which were purchased in 2009 and 2010 have begun operations and the other seven farms are expected to commence operations by the end of 2010.

30.    On November 15, 2010, the Company issued a press release entitled, "Yuhe International, Inc. Announces Third Quarter 2010 Results." Therein, the Company, in relevant part, stated:

Third Quarter 2010 Highlights

- Net revenue increased 62.4% to $21.4 million year-over-year

- Sales volume increased 34.2% to 40.3 million birds

- Gross profit increased 67.6% to $8.7 million

- Gross margin increased 130 basis points to 40.4%

- Operating income increased 73.9% to $7.4 million

- Operating margin increased 230 basis points to 34.6%

- Net income increased 75.7% to $7.3 million

- Diluted EPS increased 73.1% to $0.45

- Yuhe purchased five breeder farms in Liaoning Province, with a total production capacity of 430,000 sets of parent breeders, and Yuhe became the largest supplier of day-old broilers in China in terms of production capacity.

*    *    *

Mr. Gao added, "We are pleased to announce that we began to generate revenues from the new parent breeders that we purchased in Shangong Province in 2009 and early 2010. Of the 13 farms

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

purchased, nine have begun operations and the other four farms are expected to commence operations by the end of the first quarter of 2011.

31.    On November 15, 2010, Yuhe filed its Quarterly Report on Form 10-Q with the SEC for the 2010 fiscal third quarter.  The Company's Form 10-Q was signed by Defendants Gao and Hu, and reaffirmed the Company's financial results announced that same day.   The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Gao and Hu, substantially similar to the certifications contained in ¶23, *supra*.

32.    On March 31, 2011, the Company issued a press release entitled, "Yuhe International, Inc. Announces Unaudited Fourth Quarter and Fiscal Year 2010 Results and Provides 2011 Guidance."  Therein, the Company, in relevant part, stated:

- 2010 net revenue increased 43% year over year to $67.5 million

- 2010 gross profit increased 44.5% year over year to $24.2 million

- Adjusted net income (non-GAAP) increased 52% year over year to $19.5 million, or $1.15 per fully diluted share

- 2011 guidance for net income between $33 million and $36 million

Weifang, Shandong Province, the P.R.C. March 31, 2011 - Yuhe International, Inc. (NASDAQ: YUII) ("Yuhe" or the "Company"), a leading supplier of day-old chickens raised for meat production, or broilers, in the People's Republic of China ("PRC"), today announced its unaudited financial results for the fourth quarter and fiscal year ended December 31, 2010 and its fiscal year 2011 guidance.

Fiscal Year 2010 Highlights

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 17 -

- Net revenue was $67.5 million, a 43% year over year increase

- Gross profit was $24.2 million, a 44.5% year over year increase

- Adjusted net income (non-GAAP) was $19.5 million, a 52% year over year increase

- In December 2010, acquired ten new breeder farms, for a capacity expansion of 950,000 sets of parent breeders

- In July 2010, completed acquisition of five breeder farms, for a capacity expansion of 430,000 sets of parent breeders

"We are very pleased to report a strong fiscal year 2010 with solid financial and operational results." commented Mr. Zhentao Gao, Chairman and chief executive officer of Yuhe International, Inc. "Our 2010 non-GAAP net income of $19.5 million has surpassed our previously raised guidance of $18.5 million in net income. The growth was driven by an increase in both sales volume and average selling prices of our day-old broilers. In fiscal year 2010, we sold approximately 146 million day-old broilers, or an increase of 33% from 110 million in 2009. The full year 2010 average selling price for day-old broilers increased 9% year-over-year to RMB 2.97 per bird from RMB 2.74 per bird in 2009. We are particularly pleased with our gross margin performance in fiscal year 2010, which rose to 35.9% from 35.4% in 2009, due to our successful margin management in locking in favorable fixed-price supply contracts during the market downturn and capitalizing on the market rebounds during the third and fourth quarter of 2010."

"On the operational side, we have also achieved exceptional progress in fiscal year 2010. The first acquisition conducted by the Company in December 2009 of 13 breeder farms in Shandong Province started contributing to our production in fiscal year 2010, and currently nine out of the 13 farms are fully operational.

33.    On March 31, 2011, Yuhe filed its Annual Report on Form 10-K with the SEC for the 2010 fiscal year. The Company's Form 10-K was signed by Defendants Gao and Hu, and reaffirmed the Company's financial results announced that same day. The Company's Form 10-K also contained Sarbanes-

Oxley required certifications, signed by Defendants Gao and Hu, substantially similar to the certifications contained in ¶23, *supra*.

34.    Moreover, the Company's Annual Report filed with the SEC on March 31, 2011, in relevant part, stated:

Acquisition of 13 Breeder Farms

On December 24, 2009, PRC Yuhe entered into an agreement to purchase thirteen breeder farms for a total consideration of $15,709,792(RMB 103,870,000). As of December 31, 2010, PRC Yuhe has paid 80% of the total consideration, or $12,553,314 (RMB 83,000,000). The remaining balance of $3,156,478 (RMB 20,870,000), is expected to be paid by the end of December 2011. The farms cover a total area of 37 hectares (560 mu), for which PRC Yuhe acquired all the ground buildings as well as the land use rights for 36 years. The purchase price also includes in-house breeding facilities which supply feed, water and air to the parent breeders. In addition to the purchase price, the Company expects to spend approximately $2.49 million to renovate the facilities.

35.    On May 16, 2011, the Company issued a press release entitled, "Yuhe International, Inc. Announces First Quarter 2011 Results." Therein, the Company, in relevant part, stated:

First Quarter 2011 Highlights

- Net revenue increased 128.47% year over year to $26.86 million

- Sales volume grew 102.91% year over year to 51.86 million birds

- Gross profit increased 90.41% year over year to $7.43 million

- Operating income increased 106% year over year to $6.12 million

- Net income increased 107.36% year over year to $6.07 million, or $0.30 per fully diluted share

"We are very pleased to report a strong first quarter of fiscal year 2011. " commented Mr. Zhentao Gao, chairman and chief executive officer of Yuhe International, Inc. "While the first quarter is traditionally one of our slowest quarters in terms of sales as a result of the Chinese Lunar New Year, our year-over-year quarterly net revenue increased 128.47%, due to our successful market penetration into a wider customer base to absorb our increased production capacity. The first quarter average selling prices of our day-old broilers increased 9.81% year over year in the midst of the current inflationary marketplace. As more of our previously acquired breeder farms have begun contributing to our capacity since early 2011, we expect to continue leveraging on China's strong broiler market and to deliver superb operational and financial results."

*      *      *

Recent Development

As of the date of this press release, the Company had officially taken possession of 13 breeder farms from its previous acquisitions conducted in December 2009 and July 2010. Of these, 11 breeder farms were taken over from Weifang Dajiang Corporation, and two breeder farms were taken over from Liaoning Haicheng Songsen Stock Farming and Feed Co., Ltd.

36.     On May 16, 2011, Yuhe filed its Quarterly Report on Form 10-Q with the SEC for the 2011 fiscal first quarter.  The Company's Form 10-Q was signed by Defendants Gao and Hu, and reaffirmed the Company's financial results announced that same day.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Gao and Hu, substantially similar to the certifications contained in ¶23, *supra*.

37.     The statements contained in ¶¶19-36 were materially false and/or

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 20 -

misleading when made because defendants failed to disclose or indicate the

following: (1) that the Company had failed to execute the purchase agreement

with Weifang; (2) that the Company had not completely paid both the initial

amount and remaining balance, totaling more than $12 million, of the

agreement's total consideration to Weifang; (3) that the Company lacked

adequate internal and financial controls; and (4) that, as a result of the foregoing,

the Company's statements were materially false and misleading at all relevant

times.

### Disclosures at the End of the Class Period

38.    On or about June 16, 2011, a research report was published on the

internet entitled, "Yuhe International: Too Risky an Investment."    Therein, the

report, in relevant part, stated:

> Our due diligence findings regarding Yuhe International (YUII) raise
> serious red flags. Our most important findings:
>
> • We have reason to believe that YUII has misrepresented the details
>   surrounding its acquisition of 13 breeder farms. More specifically,
>   we believe we have compelling evidence that YUII never reached or
>   executed an agreement with the owner of the Dajiang farms, as
>   stated in December 2009,. This leads us to believe that the $12.1
>   million deposit allegedly paid to acquire the farms may have been
>   misappropriated.
>
> • We have begun to question the details surrounding the acquisitions
>   of other breeder farms allegedly consummated by YUII.
>
> • SEC filings reveal a host of other red flags.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 21 -

Over the next few days, we will disclose more information that will strengthen these findings as well as discredit the supportive documents that YUII management supplied to rebut the information we uncovered.

Given our findings, we deem YUII shares to be uninvestible.

\*       \*       \*

. . . our optimism **began to wane** once we shifted our focus to concerns about YUII's planned acquisition of 13 farms from Dajiang Enterprise Group Co., Ltd. Soon afterwards, we issued an alert to readers that we had initiated a small short position in YUII shares pending further DD. That DD led us to conclude that YUII may have misappropriated $12.1 million in the Dajiang acquisition and had misled investors regarding the details surrounding that transaction.

(i)       Background of Intent to Acquire Dajiang's Farms

As background, YUII originally announced the acquisition of Dajiang's farms in December 2009. At the time, the company claimed it paid an **80% deposit ($12.1 million)** against the purchase price and said the transaction would close by March 2010. The first disclosure regarding this transaction in a SEC filing follows:

- **Form 8-K (December 31, 2009):** Under the First Agreement, Dajiang agreed to transfer to Weifang Yuhe a total of **thirteen breeder farms** (the "Farms") with a total area of 560 mu (approximately 37 hectares) at a total consideration of **RMB 103,870,000**. The transfer consideration is to be settled in **two installments** with the first installment in the amount of RMB 83,000,000 being payable on or before December 31, 2009 and the balance being payable **within two months** following completion of the transfer. **Payment of the first installment has been made...The transfer of the Farms will be completed in or around the beginning of March 2010.**

Despite YUII's assertion that the transfer of the Dajiang farms would be completed by March 2010, the company apparently made limited

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 22 -

progress in closing the transaction for more than a year after it was first announced. Following are additional disclosures YUII made in its SEC Filings regarding the transaction:

- **2009- Form 10-K**: On December 24, 2009, PRC Yuhe entered into an agreement to purchase thirteen breeder farms at a total consideration of RMB103,870,000, approximately equivalent to $15,191,891. As of December 31, 2009, PRC Yuhe has paid 80% of the total consideration, or RMB 83,000,000, approximately equivalent to $12,139,472. **The remaining balance will be paid within two months after formal delivery of the farms, expected in early March 2010**

- **Form 8-K (January 4, 2010)**: The aggregate purchase price for the 13 breeder farms is RMB103.87 million (approximately $15.2 million). Pursuant to the agreement, Yuhe already paid 80% of the purchase price on or before December 31, 2009 and will pay the remaining balance within two months after formal delivery of the farms, expected **in early March 2010....These farms will add 600,000 sets of parent breeders for Yuhe by the third quarter of 2010.**

- **2010-Form 10-K**: On December 24, 2009, PRC Yuhe entered into an agreement to purchase thirteen breeder farms for a total consideration of $15,709,792, equivalent to approximately RMB 103,870,000. As of December 31, 2010, PRC Yuhe has paid 80% of the total consideration, or $12,553,314, equivalent to approximately RMB 83,000,000. **The remaining balance of $3,156,478**, equivalent to approximately RMB 20,870,000, is expected to be paid by the end of December 2011.

YUII **updated the disclosure** concerning the acquisition in the 2010 Form 10K stating the remaining balance of the Dajiang transaction was expected to be paid by December 2011. We found no mention in the company's public filings of why the date had been changed. However, since we did not participate in most of YUII's investors conference calls we don't know if the issue was discussed then. Regardless, given the new timeline for the closing we did not expect a near term resolution of this issue.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 23 -

On <u>May 16, 2011</u> the company announced in a press release regarding the QI 2011 financial results that it had officially **taken possession of 11 farms** from Dajiang **as of the date of the release**. There was no reference to what happened to two of the 13 farms YUII originally contracted to acquire from Dajiang.

Following is the <u>excerpt from the press release</u> disclosing the Dajiang transaction had been completed:

As of the date of this press release, the Company had officially taken possession of 13 breeder farms from its previous acquisitions conducted in December 2009 and July 2010. Of these, 11 breeder farms were taken over from Weifang Dajiang Corporation, and two breeder farms were taken over from Liaoning Haicheng Songsen Stock Farming and Feed Co., Ltd.

Certain aspects of the Dajiang acquisition **struck us as odd** including the payment of an 80% deposit on the transaction rather than a more prudent **20% or 25% down payment**. Also, the 16 months between the execution of the agreement and claimed transfer of 11 chicken farms is excessive. Finally, we are intrigued by the convenient timing of when YUII claimed that the transfer of the farms became official since it coincided with the date of the QI press release.

(ii)    Chairman and General Manager of Dajiang Denies Acquisitions

**Dajiang's Chairman and General Manager Vehemently Stated in Two Telephone Conversations that YUII Did NOT Acquire Dajiang's Farms**

Once our interest in the Dajiang transaction was piqued we decided to reach out to the Chairman and General Manager of Dajiang and get his perspective on the transaction. We obtained the Chairman's name, Mr. Xuejiang Zheng, and telephone number from the Dajiang's 2010 SAIC filing (attached).

On June 8th and 9th 2011, Geo's investigator called Mr. Zheng, the Chairman and General Manager of Dajiang Enterprise Group Co., Ltd. In both calls Mr. Zheng categorically stated that YUII **did NOT acquire** the farms owned by Dajiang. Further, YUII never had **serious**

negotiations with Dajiang, much less execute an agreement to acquire the farms. Key comments made by Mr. Zheng during the telephone conversations concerning YUII's claim to have acquired Dajiang's farms and other comments regarding YUII follow:

**First Call With Chairman Zheng, June 8, 2011**

Geo's investigator initially called Mr. Zheng on June 8th and identified himself as a representative of an investment fund interested in acquiring chicken farming operations in China. Since Mr. Zheng did not know who he was talking to he was less forthcoming in the first call than the follow up call made the next day. Despite his reticence to be too open during the first call he did reveal the following details concerning YUII's claims to have acquired Dajiang's farms:

- Mr. Zheng stated he knew of YUII but **categorically denied** there was ever an agreement for YUII to acquire Dajiang's farms. It should be noted that he also denied having been contacted by representatives from YUII.

- He further stated that YUII is a company with a **very poor reputation** in the local business community that is generally thought to be on the **verge of bankruptcy**.

- He was interested in having discussions with our investigator **concerning the sale** of Dajiang's farms.

                    *       *       *

**Second Call with Chairman Zheng, June 9, 2011**

Geo's investigator made a second call to Mr. Zheng the following day. This time Zheng was more forthcoming about a discussion **he did in fact** have with YUII representatives in 2009 and provided details regarding the meeting.

- Mr. Zheng was approached by YUII in the fall of 2009. He stated that only one discussion concerning Dajiang and its operations took place and there were **no formal negotiations** for YUII to acquire the farms.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 25 -

- YUII's representative shared with Mr. Zheng that the company was in the process of **raising capital** in the US markets and having an acquisition of Dajiang's farms **would help that process**. They wanted Mr. Zheng to **"do them a favor"** and work with them to come up with a deal that would be attractive to US investors.

- Zheng stated that YUII's offices are located close to Dajiang's so he knew of the company. He stated that YUII is, **"not a good company and did not have strong capacity."**

- YUII proposed a **fake deal** which would result in Dajiang's farms being listed under YUII's name. The idea was for YUII to **rent** the farms from Dajiang or enter a joint venture with Dajiang so YUII could claim control/ownership.

- Zheng was initially somewhat intrigued that he could use an investment from YUII to renovate and upgrade his farms but he was **put off** by YUII's unprofessional approach and **shady propositions**.

- Zheng **rejected** YUII's approach and there were **no further discussions** between the two companies.

The bottom line is that according to the Chairman of Dajiang, YUII did NOT acquire Dajiang's farms and there is and never was an official agreement in place for them to do so. The transcripts and recording of these two conversations are enclosed to this report.

39.    On this news, the Company's shares declined $2.12 per share, or nearly 52%, to close on June 16, 2011, at $1.96 per share, on unusually heavy trading volume.

40.    On June 17, 2011, Yuhe hosted a conference call during which Company executives denied that it had misled investors, but admitted that the Company had failed to disclose that the acquisition for the thirteen breeder farms

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 26 -

had never gone through. The Company further disclosed that when Weifang had decided to not execute the transaction, Yuhe's chairman and CEO, Gao, decided to put the $12 million deposit for the transaction into a private bank account. The Company claimed that these funds that were kept in Gao's personal account were subsequently used to purchase eleven different farms from a separate seller.

41.    On this news, the Company's shares declined $0.75 per share, or more than 38%, on June 17, 2011, to $1.21 per share, on unusually heavy trading volume, before trading of the Company's shares was subsequently halted during that day.

42.    On June 23, 2011, the Company filed a Current Report on Form 8-K with the SEC. Therein, the Company, in relevant part, stated:

Changes in Registrant's Certifying Accountant

On June 20, 2011, the audit committee of Yuhe International, Inc. (the "Company") received a letter from Child, Van Wagoner & Bradshaw, PLLC ("CVWB"), the Company's independent registered public accounting firm, dated June 17, 2011 stating that the client-auditor relationship between the Company and CVWB has ceased due to the Company's management's misrepresentation and failure to disclose material facts surrounding certain acquisition transactions and off-balance sheet related party transactions. The Company's board of directors has accepted the decision of CVWB.

The report of CVWB on the Company's consolidated financial statements for the year ended December 31, 2010 contained no adverse opinion or disclaimer of opinion, and such report was not qualified or modified as to uncertainty, audit scope or accounting principles.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

During the year ended December 31, 2010, and the subsequent interim period through March 31, 2011, there were no disagreements between the Company and CVWB on any of the matters described in Item 304(a)(1)(iv) of Regulation S-K.

There have been no other "reportable events" as defined in Item 304(a)(1)(v) of Regulation S-K. The Company has provided CVWB with a copy of the disclosures it is making in this Current Report on Form 8-K (this "Form 8-K"). The Company has requested that CVWB furnish a letter addressed to the Securities and Exchange Commission (the "SEC") stating whether or not it agrees with the statements made herein. On June 23, 2011, the Company received a letter from CVWB stating that it is in agreement with the statements regarding CVWB contained in this Form 8-K.

The Company has authorized CVWB to respond fully to the inquiries of any successor independent registered public accounting firm concerning the reportable event.

*       *       *

Non-reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review

On June 20, 2011, the audit committee of the Company received a letter from CVWB dated June 17, 2011 stating that its auditor's report on the financial statements of the Company for the year ended December 31, 2010 contained in the Form 10-K filed with the SEC on March 31, 2011 should no longer be relied upon and must no longer be associated with the financial statements due to the Company's management's misrepresentation and failure to disclose material facts surrounding certain acquisition transactions and off-balance sheet related party transactions.

CVWB had no discussions with the Company's board of directors, audit committee or any authorized officers with respect to non-reliance on its auditor's report on the financial statements of the Company for the year ended December 31, 2010. The Company's audit committee determined on June 23, 2011 that, as a result of the letter from CVWB, the auditor's report on the financial statements of

the Company for the year ended December 31, 2010 contained in the Form 10-K filed with the SEC on March 31, 2011 should no longer be relied upon.

The Company has provided CVWB with a copy of the disclosures it is making in this Form 8-K. The Company has requested that CVWB furnish a letter addressed to the SEC stating whether or not it agrees with the statements made herein. On June 23, 2011, the Company received a letter from CVWB stating that it is in agreement with the statements regarding CVWB contained in this Form 8-K.

## CLASS ACTION ALLEGATIONS

43.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who purchased Yuhe securities between December 31, 2009, and June 17, 2011, inclusive (the "Class Period"), and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

44.    The members of the Class are so numerous that joinder of all members is impracticable. During the Class Period, Yuhe securities were actively traded on the NASDAQ Stock Market ("NASDAQ"). While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Millions of Yuhe shares were traded

publicly during the Class Period on the NASDAQ and as of March 30, 2011, the Company had 20,249,563 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Yuhe or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

45.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

46.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

47.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the operations, financial performance and prospects of Yuhe; and

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

48.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

49.    The market for Yuhe securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Yuhe securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Yuhe securities relying upon the integrity of the market price of the Company's securities and market information relating to Yuhe, and have been damaged thereby.

50.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Yuhe securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary

to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Yuhe's business, operations, and prospects as alleged herein.

51.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Yuhe's financial performance and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## LOSS CAUSATION

52.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

53.    During the Class Period, Plaintiff and the Class purchased Yuhe securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

54.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Yuhe, his/her control over, and/or receipt and/or modification of Yuhe's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Yuhe, participated in the fraudulent scheme alleged herein.

//

//

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

55.    The market for Yuhe securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Yuhe securities traded at artificially inflated prices during the Class Period.  On March 9, 2010, the Company's stock closed at a Class Period high of $12.28 per share.   Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Yuhe securities and market information relating to Yuhe, and have been damaged thereby.

56.    During the Class Period, the artificial inflation of Yuhe stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Yuhe's financial performance and prospects.   These material misstatements and/or omissions created an unrealistically positive assessment of Yuhe and its business, operations, and financial performance, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other

members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

57.    At all relevant times, the market for Yuhe securities was an efficient market for the following reasons, among others:

(a)    Yuhe stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    As a regulated issuer, Yuhe filed periodic public reports with the SEC and the NASDAQ;

(c)    Yuhe regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Yuhe was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.    Each of these reports was publicly available and entered the public marketplace.

58.    As a result of the foregoing, the market for Yuhe securities promptly digested current information regarding Yuhe from all publicly available sources

and reflected such information in Yuhe's stock price. Under these circumstances, all purchasers of Yuhe securities during the Class Period suffered similar injury through their purchase of Yuhe securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

59.   The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Yuhe who knew that the statement was false when made.

# FIRST CLAIM

## Violation of Section 10(b) of the Exchange Act
## and Rule 10b-5 Promulgated Thereunder
## Against All Defendants

60.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Yuhe's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

62.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Yuhe's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

63.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Yuhe's financial well-being and prospects, as specified herein.

64.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Yuhe's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Yuhe and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

65.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer

and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

66.    The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Yuhe's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by

deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

67. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Yuhe securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Yuhe securities during the Class Period at artificially high prices and were damaged thereby.

68. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the Company's improper accounting practices, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Yuhe securities, or, if they had acquired such

securities during the Class Period, they would not have done so at the artificially

inflated prices which they paid.

69.    By virtue of the foregoing, Defendants have violated Section 10(b) of

the Exchange Act and Rule 10b-5 promulgated thereunder.

70.    As a direct and proximate result of Defendants' wrongful conduct,

Plaintiff and the other members of the Class suffered damages in connection with

their respective purchases and sales of the Company's securities during the Class

Period.

### SECOND CLAIM

**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

71.    Plaintiff repeats and realleges each and every allegation contained

above as if fully set forth herein.

72.    The Individual Defendants acted as controlling persons of Yuhe

within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By

virtue of their high-level positions, and their ownership and contractual rights,

participation in and/or awareness of the Company's operations and/or intimate

knowledge of the false financial statements filed by the Company with the SEC

and disseminated to the investing public, the Individual Defendants had the power

to influence and control and did influence and control, directly or indirectly, the

decision-making of the Company, including the content and dissemination of the

various statements which Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

73.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

74.   As set forth above, Yuhe and the Individual Defendants each violated either Section 10(b) or Rule 10b-5, by their acts and/or omissions as alleged in this Complaint.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)   Determining that this action is a proper class action under Rule 23 of

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 42 -

the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: July 1, 2011                    GLANCY BINKOW & GOLDBERG LLP

                                       By:
                                       Casey E. Sadler
                                       Lionel Z. Glancy
                                       Michael Goldberg
                                       1801 Avenue of the Stars, Suite 311
                                       Los Angeles, California 90067
                                       Telephone:  (310) 201-9150
                                       Facsimile:  (310) 201-9160

                                       LAW OFFICES OF HOWARD G. SMITH
                                       Howard G. Smith
                                       3070 Bristol Pike, Suite 112
                                       Bensalem, PA 19020
                                       Telephone:  (215) 638-4847
                                       Facsimile:  (215) 638-4867

                                       *Attorneys for Plaintiff Jeff Feyko*

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
- 43 -

## SWORN CERTIFICATION OF PLAINTIFF

Yuhe International, Inc., SECURITIES LITIGATION

I, Jeff Feyko, certify that:

1.  I have reviewed the complaint and authorized its filing.

2.  I did not purchase Yuhe International, Inc, the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Yuhe International, Inc. during the class period set forth in the Complaint are as follows:

    I bought __1576__ shares on __6/16/11__ at $ __3.10__ per share.
    I bought __908__ shares on __6/16/11__ at $ __3.16__ per share.
    I bought _____ shares on ____/____/____ at $ _____ per share.
    I bought _____ shares on ____/____/____ at $ _____ per share.
    I bought _____ shares on ____/____/____ at $ _____ per share.

    I sold _____ shares on ____/____/____ at $ _____ per share.
    I sold _____ shares on ____/____/____ at $ _____ per share.
    I sold _____ shares on ____/____/____ at $ _____ per share.
    I sold _____ shares on ____/____/____ at $ _____ per share.
    I sold _____ shares on ____/____/____ at $ _____ per share.

    (List Additional Transactions on a Separate Page if Necessary)

5.  I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

    ____ Check here if you are a current employee or former employee of the defendant Company.

    I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: __6/29/11__

_____
(Please Sign Your Name Above)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Dean D. Pregerson and the assigned discovery Magistrate Judge is Patrick J. Walsh.

The case number on all documents filed with the Court should read as follows:

## CV11- 5511 DDP (PJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [X] **Western Division**<br>312 N. Spring St., Rm. G-8<br>Los Angeles, CA 90012 | [ ] **Southern Division**<br>411 West Fourth St., Rm. 1-053<br>Santa Ana, CA 92701-4516 | [ ] **Eastern Division**<br>3470 Twelfth St., Rm. 134<br>Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Casey E. Sadler (#274241)
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone: (310) 201-9150

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

JEFF FEYKO, Individually and on Behalf of All
Others Similarly Situated,

PLAINTIFF(S)

v.

YUHE INTERNATIONAL, INC., GAO ZHENTAO,
and HU GANG.

DEFENDANT(S).

CASE NUMBER

CV11-05511 DDP (PJWx)

**SUMMONS**

TO:    DEFENDANT(S): THE ABOVE-NAMED DEFENDANTS

A lawsuit has been filed against you.

Within   21   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, Casey E. Sadler _____, whose address is 1801 Avenue of the Stars, Suite 311, Los Angeles, CA 90067 . If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

JUL - 1 2011

Dated: _____

Clerk, U.S. District Court

By: _____
   Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

# ORIGINAL

Name & Address:
Casey E. Sadler (#274241)
GLANCY BINKOW & GOLDBERG LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Telephone:  (310) 201-9150

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFF FEYKO, Individually and on Behalf of All Others Similarly Situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>YUHE INTERNATIONAL, INC., GAO ZHENTAO, and HU GANG.<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV11-05511**DDP(PJWX)<br><br><br>**SUMMONS** |

TO:    DEFENDANT(S): <u>THE ABOVE-NAMED DEFENDANTS</u>

_____

A lawsuit has been filed against you.

Within    21    days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, <u>Casey E. Sadler</u>, whose address is <u>1801 Avenue of the Stars, Suite 311, Los Angeles, CA 90067</u>.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: <u>    JUL - 1 2011    </u>

**JULIE PRADO**

By: _____

SEAL

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*



---
CV-01A (12/07)                                    SUMMONS

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)

JEFF FEYKO, Individually and on Behalf of All Others Similarly Situated,

**DEFENDANTS**

YUHE INTERNATIONAL, INC., GAO ZHENTAO, and HU GANG.

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Casey E. Sadler (#274241)
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars, Suite 311, Los Angeles, CA 90067, T. (310) 201-9150

Attorneys (If Known)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2. Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:   JURY DEMAND:** ☑ Yes   ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes ☐ No          ☐ **MONEY DEMANDED IN COMPLAINT: $** to be proved

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Violation of Section 10(b) and 20(a) of the Securities Exchange Act and Violation of SEC Rule 10b-5

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☑ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 630 Liquor Laws | **SOCIAL SECURITY** |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | **REAL PROPERTY** | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

**CV11-05511**

---

**FOR OFFICE USE ONLY:**   Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No   ☐ Yes
If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or
☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | Bucks County, PA |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | People's Republic of China |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which EACH claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County, CA |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date July 1, 2011

Notice to Counsel/Parties: The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |