O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JEFF FEYKO, individually and on behalf of all others similarly situated,

                   Plaintiff,

  v.

YUHE INTERNATIONAL, INC., GAO ZHENTAO and HU GANG.,

                 Defendants.

_____

Case No. CV 11-05511 DDP (PJWx)

ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO DISMISS AND STRIKE

[Docket Nos. 79-83]

## I. **Background**

Lead Plaintiff aAd Partners LP alleges that it purchased shares of common stock of Yuhe International, Inc. ("Yuhe"), during the class period, including in the October 20, 2010 secondary offering of Yuhe shares.  (Supplemental Consolidated Class Action Complaint ("CAC") ¶ 17, Docket No. 70.)  There are three groups of Defendants in this case (collectively "Defendants").  The "Yuhe Defendants" are comprised of Yuhe ("Yuhe"), and the "Individual Defendants": Zhentao Gao ("Gao"), Yuhe's CEO, Chairman of the Board, and largest shareholder, Hu Gang ("Gang"), Yuhe's CFO; and

1   Jiang Yingjun ("Yingjun"), Yuhe's Chief Accounting Officer.  (Id.
2   ¶¶ 19-21.)  The second group is comprised only of Child, Van
3   Wagoner & Bradshaw ("the Auditor Defendant"), which was Yuhe's
4   independent auditor from March 12, 2008 to December 7, 2009, and
5   from March 9, 2010 to June 17, 2011.  (Id. ¶ 27.)  The third group
6   is called the "Underwriter Defendants."  They are Roth Capital
7   Partners, LLC ("Roth");  Brean Murray, Carret & Co., LLC; and
8   Global Hunter Securities, LLC, and they were the underwriters for
9   Yuhe's October 20, 2010 public offering, with Roth serving as the
10  "book-running manager of the Offering".  (Id. ¶¶ 23, 25-26.)[1]

11      The CAC alleges four claims, with the first and second falling
12  under the Securities Exchange Act of 1934 and the third and fourth
13  under the Securities Act of 1933.  Lead Plaintiff's first claim
14  alleges the Yuhe Defendants violated Section 10(b) of the Exchange
15  Act.  The second claim alleges the Individual Defendants were
16  control persons, who violated Section 20(a) of the Exchange Act.
17  The third claim alleges that all Defendants violated Sections 11
18  and 15 of the Securities Act.  Lead Plaintiff's fourth claim
19  alleges that the Underwriter Defendants violated Section 12(a)(2)
20  of the Securities Act.  All Defendants have moved to dismiss all
21  claims against them.  The Yuhe Defendants and the Underwriter
22  Defendants have also moved to strike Lead Plaintiff's CAC.  For the
23  reasons stated below, the Court DENIES the Defendants' motions,
24  with the exception of GRANTING dismissal of the Section 11 claim

25
26      [1]Rodman & Renshaw, LLC ("Rodman") was also an underwriter, and was also
27  named as a defendant in this action.  (Id. at ¶ 24.)  However, Rodman has filed
    for bankruptcy.  (Docket No. 126.)  Pursuant to section 326 of the Bankruptcy
    Code, the instant action is stayed as to Rodman only.  The Court notes that Lead
28  Plaintiff has not objected to staying the action against Rodman.

1   against the Underwriter Defendants, GRANTING Dismissal of the

2   Section 10(b) claim against Gang, and GRANTING dismissal of the

3   Section 12(a)(2) and Section 11 claims of all subclass members

4   whose Yuhe shares are only traceable to the second offering.

5   Dismissal is without prejudice, except as to the Section 12(a)(2)

6   claims.

7        Yuhe sells broiler chickens. (CAC ¶ 18.) On December 31,

8   2010, Yuhe filed a Form 8-K announcing that it entered into an

9   agreement with Waifang Dajiang ("Dajiang") to purchase thirteen

10  breeder farms, and that Yuhe had already paid the first of two

11  installments on those farms. (Id. ¶ 44.) Another Form 8-K, filed

12  on January 4, 2010, attached a press release that was entitled

13  "Yuhe International, Inc. Increases Number of Breeder Farms to 27."

14  (Id. ¶ 45.) Gao was quoted in this press release as stating, "By

15  purchasing these thirteen breeder farms, we are able to quickly

16  increase our production capacity of day-old broilers." (Id.) The

17  acquisition was touted as increasing Yuhe's "capacity by 60%."

18  (Id. ¶ 46.) On March 11, 2010, Yuhe reported that its independent

19  auditor, Grant Thornton, resigned on March 5, 2010. (Id. ¶ 47.)

20  Yuhe's Form-10k Annual Report for 2009 was filed on March 31, 2010,

21  and repeated that Yuhe contracted to purchase thirteen breeder

22  farms from Dajiang, and had paid 80% of the total consideration by

23  December 31, 2009. (Id. ¶ 49.) Gao, Gang, and Yingjun signed the

24  Form 10-K, and Gao and Gang signed its Sarbanes-Oxley

25  certification. (Id. at ¶ 50.) Between March and October 2010 a

26  number of Yuhe's SEC filings indicated that it had acquired the

27  thirteen breeder farms from Dajiang. (Id. at ¶¶ 46, 48, 49, 53-

28  59.) Yuhe's October 20, 2010 Prospectus Supplement incorporated

many of the SEC filings discussed above.  (<u>Id.</u> at ¶¶ 71-72.)  It also incorporated the Auditor Defendant's opinion, which contained various alleged misrepresentations about the Dajiang acquisition. (<u>Id.</u> at ¶¶ 90-101.)  From October 20, 2010, to November 2, 2010, Yuhe sold $4,140,000 newly-issued shares at $7 each pursuant to its second offering.  (<u>Id.</u> at ¶¶ 60,61.)  The Underwriter Defendants were awarded shares pursuant to this offering.  (<u>Id.</u>)

On May 16, 2011, Yuhe filed Form 10-Q with the SEC, with Gao and Gang signing its accompanying Sarbanes-Oxley certifications, which reaffirmed that Yuhe acquired thirteen breeder farms from Dajiang in December 2009, and had already paid Dajiang over $12 million in this transaction.  (<u>Id.</u> ¶ 67.)

On June 8, 2011, GeoInvesting spoke with Mr. Xuejing Zheng ("Zheng"), Chairman and General Manager of Dajiang.  (<u>Id.</u> ¶ 76.) Zheng told GeoInvesting that Yuhe never purchased breeding farms from Dajiang, nor had the two discussed such an acquisition.  (<u>Id.</u> ¶ 77.)  The next day, GeoInvesting again spoke with Zheng, in part because it heard that Dajiang and Yuhe actually engaged in acquisition negotiations with Yuhe in 2009.  (<u>Id.</u> ¶ 78.)  Zheng admitted that the two did talk, but that it was only once, and that Dajiang "did not proceed with this deal."  (<u>Id.</u>)  Zheng also stated that the only deal Yuhe proposed was a fake deal: "They told us to make a fake deal—it's like I lease your facilities to make a fake deal for my US listing. . . ."  (<u>Id.</u> ¶ 78 (internal quotation mark omitted).)

On June 13, 2011, GeoInvesting released transcripts of its conversations with Zheng, and Yuhe's stock price dropped 12.77% that day.  (<u>Id.</u> ¶¶ 75-76, 103-104.)  The next day, Yuhe held a

4

conference call, where it asserted that Zheng was asked misleading questions, and that Zheng would cooperate with Yuhe to clear up the "misunderstandings." (Id. ¶ 80.)  Yuhe's stock closed at $4.35 on that day.  (Id. ¶ 105.)

The next day, GeoInvesting had another conversation with Zheng, where he insisted Dajiang and Yuhe never reached an agreement: "Did not reach the agreement. After the failure to do a deal with us, I don't know why Yuhe claims this in the United States. Maybe for cheating money or for cheating to list in the United States?" (Id. ¶ 81.)  GeoInvesting released this conversation on June 16, and Yuhe's stock dropped to $1.96 per share that day.  (Id. ¶ 107.)

On June 17, 2011, Yuhe hosted a conference call, where its representatives stated that the contract with Dajiang had been retracted, and that the funds for that transaction were put into a different company.  (Id. ¶ 83.)  Below are excerpts of what the CEO (Gao), CFO, and CAO said on the conference call about what happened with the Dajiang deal, why it was not disclosed, and what the company did with the money it previously asserted was already paid in that deal:

- CAO: "[W]e worried that the cancellation of the contract and refunded cash would provoke negative reactions from the capital market."

- CEO: "[M]anagement was under huge pressure to deliver what we had previously promised."

- CFO: "The contract retract happened after our previous auditor Grant Thorton resigned [March 5, 2010], so CEO worried that a

retracted contract would increase negative investor sentiments and adversely affected [sic] the share price."

• CEO: "[I]f the Company just put these [sic] money aside for cash reservation of purchasing additional breeder farms other than those farms from Dajiang, it wouldn't impact the financials or the Company and hence no volatility in the share price."

• When one individual on the call "pointed out that as of May 16, 2011, Yuhe represented that it had possession of the thirteen Dajiang breeding farms," the CEO responded: "After the incident, the management was under huge pressure to deliver what we had previously promised. . . The CEO takes full responsibility for not disclosing the change in a timely manner. . . ."

(Id. ¶¶ 47, 83.)

On June 17, 2011, the Auditor Defendant resigned, in light of the "Company's management's misrepresentation and failure to disclose material facts surrounding certain acquisition transactions and off-balance sheet related party transactions." (Id. ¶ 84.)  On June 28, 2011, NASDAQ delisted Yuhe, citing the company's "false public disclosures, which persisted for well over a year, related to the Company's purported acquisition of farms Dajiang."  (Id. ¶ 85.)

## II. **Legal Standard**

A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544,

570 (2007)).  When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." <u>Resnick v. Hayes</u>, 213 F.3d 443, 447 (9th Cir. 2000).  Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." <u>Iqbal</u>, 556 U.S. at 678.  Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." <u>Id.</u> at 679.  In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted. <u>Id.</u> at 678 (citations and internal quotation marks omitted).

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." <u>Id.</u> at 679.  Plaintiffs must allege "plausible grounds to infer" that their claims rise "above the speculative level." <u>Twombly</u>, 550 U.S. at 555-56. "Determining whether a complaint states a plausible claim for relief" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." <u>Iqbal</u>, 556 U.S. at 679.

**III. <u>Analysis</u>**

**A. <u>Yuhe Defendants' Motion to Dismiss the Section 10(b) Claim</u>**

To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder,

7

plaintiffs must plead particularized facts demonstrating "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009) (citations and internal quotation marks omitted).

The Yuhe Defendants argue Lead Plaintiff's Section 10(b) claim should be dismissed for several reasons. First they argue that "allegations based on the" GeoInvesting report "should be rejected." (See generally Docket No. 82 at 7:3-9:20.) Because the Yuhe Defendants' argument on this point closely parallels its motion to strike, it will be discussed in the analysis of that motion. Although the standard for a motion to strike is different from one to dismiss, the Yuhe Defendants' motion to dismiss argument fails for the same reason its motion to strike argument fails.

The Yuhe Defendants next state that the CAC does not plead material misrepresentations. (Id. at 9:21-10:13, 16:8-17:5.) In alleging a Section 10(b) claim under the Private Securities and Litigation Reform Act, a plaintiff must meet heightened standards for alleging falsity and scienter. In alleging falsity, a Plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. 78u-4(b)(1). A statement must be false when made to be actionable. In re Am. Apparel, Inc. S'holder Litig., 855 F. Supp. 2d 1043, 1071

(C.D. Cal. 2012).  "For purposes of securities fraud, materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information. . . .  A statement is material if a reasonable investor would have considered it useful or significant."  United States v. Jenkins, 633 F.3d 788, 802 (9th Cir. 2011) (internal quotation marks and citations omitted). "Questions of materiality ... involv[e] assessments peculiarly within the province of the trier of fact. . . . Thus, the ultimate issue of materiality [is] appropriately resolved as a matter of law only where the omissions are so obviously important to an investor, that reasonable minds cannot differ. . ."  Siracusano v. Matrixx Initiatives, Inc., 585 F.3d 1167, 1178 (9th Cir. 2009), aff'd, 131 S. Ct. 1309 (U.S. 2011) (internal quotation marks and citations omitted).

Lead Plaintiff has pled that a material misrepresentation occurred.[2]  As discussed, Zheng told GeoInvesting that no agreement was ever reached between Yuhe and Dajiang, thus making all Yuhe's SEC filings, at least one of which all of the Individual Defendants signed, reporting the contrary false.

Putting the statements that Zheng made to GeoInvesting aside, Lead Plaintiff has still shown that there was a misrepresentation. Although the Individual Defendants stated in the June 17, 2011 conference call that they had a contract with Dajiang, the CEO makes clear that the contract was cancelled by in March 2010: "From

---

[2] The Court is under no obligation to evaluate every misrepresentation that was made in the CAC, because Plaintiff can survive a motion to dismiss by alleging a single material misrepresentation. See Cunha v. Hansen Natural Corp., No. EDCV 08-1249-GW JCX, 2011 WL 8993148 (C.D. Cal. May 12, 2011) (holding that "there is no reason that [the Court] must address parts of the CAC that do not work.")

March 2010 to the present, the company had completed the acquisition of eleven breeder farms with the cash refunds from Dajiang." (CAC ¶ 83.) However, and as discussed, from March 2010 through May 2011 Yuhe represented to the SEC on a number of occasions that it had an agreement with Dajiang, and on one such occasion, all of the Individual Defendants signed a document containing the misrepresentation. (Id. ¶ 83.)

The Court does not find that these misrepresentations were immaterial as a matter of law. Materiality is rarely appropriate to decide at the motion to dismiss stage. Siracusano, 585 F.3d at 1178. The Yuhe Defendants' best argument that the misrepresentations were immaterial is that Yuhe began purchasing other breeding farms when the Dajiang deal failed. (CAC ¶ 83.) As the complaint states, eleven were acquired from March 2010 to June 2011. (Id.) However, acquiring different farms at a later date does not moot the materiality of the Dajiang misrepresentations.

The Yuhe Defendants also assert that Lead Plaintiff cannot show scienter. The scienter requirement is satisfied when "a complaint . . . allege[s] that the defendant made false or misleading statements either intentionally or with deliberate recklessness." In re VeriFone Holdings, Inc. Sec. Litig., No. 11-15860, 2012 WL 6634351, at *4 (9th Cir. Dec. 21, 2012) (quotation marks omitted). Scienter is shown "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 991 (9th Cir. 2009) (quotation marks omitted). To determine scienter, the complaint's allegations must be read "holistcally." In re

10

<u>VeriFone</u>, 2012 WL 6634351, at *5.  The Ninth Circuit has recently made clear that courts do not need to consider whether each allegation of scienter creates a strong inference of that mental state, because a holistic review will suffice.  <u>Id.</u> at *6 (engaging in a holistic analysis, but noting a dual analysis, where allegations are analyzed individually and then holistically, is "permissible").

Lead Plaintiff has sufficiently alleged scienter as to Gao, and thus has also successfully alleged it as to Yuhe.  <u>See</u> <u>Glazer</u> <u>Capital Mgmt., LP v. Magistri</u>, 549 F.3d 736, 744 (9th Cir. 2008). The CEO, Gao, proposed a "fake deal" to Zheng in order to lure American investment.  (CAC ¶ 78.)  Moreover, Gao and the CAO, Yingjun, both made remarks at the June 17 conference call indicating that they intentionally did not reveal that the Dajiang deal was "retract[ed]":

- CAO: "[W]e worried that the cancellation of the contract and refunded cash would provoke negative reactions from the capital market."

- CEO: "[M]anagement was under huge pressure to deliver what we had previously promised."

- CFO: "The contract retract happened after our previous auditor Grant Thorton resigned, so CEO worried that a retracted contract would increase negative investor sentiments and adversely affected [sic] the share price."

- CEO: "[I]f the Company just put these [sic] money aside for cash reservation of purchasing additional breeder farms other than those farms from Dajiang, it wouldn't impact the

financials of the Company and hence no volatility in the share
price."

(Id. ¶ 83.)

There is also sufficient scienter regarding Yingjun.  On the
June 17, 2011, conference call he expressed taking part in a scheme
to hide the fact that the Dajiang deal fell through, which on that
call was claimed to have occurred by March 2010: "Since we had a
contract signed with Dajiang and the contract was disclosed, we
worried that the cancellation of the contract and refunded cash
would provoke negative reactions from the capital market."  (Id.)
The heightened scienter standard is not met for Gang, the CFO,
though.   The CAC avers that the CEO hid the breakdown of the
Dajiang deal from Gang.  (Id.)  Additionally, the CAC does not
provide enough information about Gao's duties as CFO for the Court
to infer that he would have had knowledge of something the CEO
actively hid from him.  (See id. ¶ 116) (describing the Individual
Defendants' job duties generally, and not specifically discussing
Gao's).

**B.  The Section 11 Claim Against All Defendants**

The CAC states that all Defendants are liable under Section 11
of the Securities Act, because there were materially false
statements about the Dajiang acquisition in the Prospectus and
Prospectus Supplement for Yuhe's second stock offering.  (CAC ¶¶
129-44.)  The Yuhe Defendants and the Underwriter Defendants argue
Lead Plaintiff does not have standing to pursue a Section 11
claim.[3]

---

[3]The Underwriter Defendants also argue that the Section 11 claim should be
(continued...)

Section 11 of the Securities act "provides a cause of action to any person who buys a security issued under a materially false or misleading registration statement." <u>In re Century Aluminum Co. Sec. Litig.</u>, No. 11-15599, 2013 WL 11887, at *1 (9th Cir. Jan. 2, 2013).  To have standing to sue under Section 11 plaintiffs must show they "have purchased shares in the offering made under the misleading registration statement," or if they purchased their shares in the aftermarket standing will be found "provided they can trace their shares back to the relevant offering." <u>Id.</u>  The latter approach is "often impossible," and conclusory allegations in the complaint that the shares are traceable will not suffice.  <u>Id.</u> at *1-2.

The CAC alleges that on October 20, 2010 there was a second offering for Yuhe stock at a price of $7 per share.  (CAC ¶ 60.) It is also alleged that Lead Plaintiff bought shares "pursuant to the October 20, 2010 Prospectus Supplement," and that it purchased stock "pursuant to the offering."  (CAC ¶¶ 17, 60, 130, 139.)  When plaintiffs purchase stock pursuant to an offering or a prospectus, it means that they have purchased stock from its issuer.  <u>See</u> <u>In re Levi Strauss & Co. Sec. Litig.</u>, 527 F. Supp. 2d 965, 983 (N.D. Cal. 2007); <u>In re Nat'l Golf Properties, Inc.</u>, No. CV 02-1383GHK(RZX), 2003 WL 23018761, at *2.  A conclusory statement that stock is traceable to a particular offering will not suffice, because it is difficult to trace the chain of custody of stock in the aftermarket.  <u>In re Century Aluminum Co. Sec. Litig.</u>, 2013 WL

---

[3](...continued)
stricken for this same reason.  The Underwriter Defendants motion to strike argument, thus, fails for the same reason its motion to dismiss argument does.

11887, at *2 (9th Cir. Jan. 2, 2013).  However no such difficulty exists when stock is purchased pursuant to a prospectus or offering, so Plaintiff's allegations in paragraphs 17, 60, 130, and 139 will suffice.  Nevertheless, since Plaintiff seeks to represent members of the Subclass who purchased Yuhe stock that is traceable to the secondary offering, and since Lead Plaintiff does not provide any detailed analysis as to how these Subclass members' shares can be traced to the relevant offering, the Court dismisses the Section 11 claims of these subclass members.  (CAC ¶ 1; <u>See generally</u> CAC); <u>See</u> <u>In re Century Aluminum Co. Sec. Litig.</u>, 2013 WL 11887, at *1-2.

The Yuhe Defendants next state that Lead Plaintiff's Section 11 claim sounds in fraud, and that Lead Plaintiff has not alleged sufficient facts to prove such a claim.  "To ascertain whether a complaint 'sounds in fraud' we must normally determine, after a close examination of the language and structure of the complaint, whether the complaint 'allege[s] a unified course of fraudulent conduct' and 'rel[ies] entirely on that course of conduct as the basis of a claim.'"  <u>Rubke v. Capitol Bancorp Ltd</u>, 551 F.3d 1156, 1161 (9th Cir. 2009) (citation omitted).  Lead Plaintiff does not seriously contest whether the Section 11 claim against the Yuhe Defendants sounds in fraud; it only argues that it satisfied its pleading obligations should the Court find that it does.  (Docket No. 111 at 22:14-19.)  Lead Plaintiff has, thus, conceded that this

claim against the Yuhe Defendants sounds in fraud.[4]  Cent. Dist. L.R. 7-12.

A Section 11 claim that sounds in fraud does not need to meet the "heightened pleading requirements of the PSLRA," but under Rule 9(b) the claim must "set forth what is false or misleading about a statement, and why it is false." Rubke, 551 F.3d at 1161 (citations omitted).  As discussed, the October 20, 2010 Prospectus Supplement incorporated by reference a number of previous SEC filings that falsely claimed, among other misrepresentations, that Yuhe had an agreement with Dajiang.  (CAC ¶¶ 71-72.)  Therefore, Lead Plaintiff has met its burden regarding alleging a Section 11 claim that sounds in fraud.  The Auditor Defendant argues that it is entitled to a loss causation affirmative defense as a matter of law.  "To establish a 'loss causation' defense under Section 11(e), [defendant] needed to prove that the depreciation in value . . . resulted from factors other than the . . . material misstatement." In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1422 (9th Cir. 1994) (internal quotations and citation omitted).  Because of the "fact-intensive" nature of a causation analysis, it usually must be established in summary judgment or trial, not a motion to dismiss. In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1171 (C.D. Cal. 2008).  The burden for proving loss causation is

---

[4]Although Lead Plaintiff's Section 11 claim against the Yuhe Defendants sounds in fraud, this ruling does not automatically apply to the other Defendants. Mallen v. Alphatec Holdings, Inc., 861 F. Supp. 2d 1111, 1125 (S.D. Cal. 2012); In re Fuwei Films Sec. Litig., 634 F. Supp. 2d 419, 437 (S.D.N.Y. 2009).  The Underwriter Defendants do not argue this point.  The Auditor Defendant seems to argue it in the reply brief, (Docket No. 120 at 2:8-25), but the Court need not consider new arguments first raised in a reply brief.  See Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007) (affirming district court's decision to reject points raised for the first time in reply).

"heavy," and the defense "can be used as a ground for dismissal on a Rule 12(b)(6) motion to dismiss only if the merits of the defense are apparent on the [complaint's] face. . ." In re DDi Corp. Sec. Litig., No. CV 03-7063 NM, 2005 WL 3090882 (C.D. Cal. July 21, 2005) (internal quotation marks and citations omitted).

The Auditor Defendant is alleged to have reported Yuhe's finances in a way that falsely made it look like Yuhe had purchased the Dajiang farms, when Yuhe had not.  (CAC ¶¶ 91-92.) Principally, the Auditor Defendant argues: "[T]he conclusion is inescapable that the decline in the value of Yuhe's shares was due to the combination of [the Auditor Defendant's] resignation driven by events that occurred in connection with the report of GeoInvesting . . ."  (Docket No. 80 at 10:1-5.)  However, the Auditor Defendant's resignation and the GeoInvesting Report are not so separable from the Auditor Defendant's alleged misstatements. GeoInvesting's report exposed Yuhe's misrepresentation about acquiring breeder farms from Dajiang, a misrepresentation that the Auditor Defendant's analysis of Yuhe's finances further propagated. Because the Auditor Defendant's alleged misrepresentation is interrelated to Yuhe's, because Yuhe's stock dropped when that misrepresentation was exposed, and because causation is rarely appropriate at the motion to dismiss stage, the Court cannot find that the Auditor Defendant is entitled to the loss causation defense as a matter of law.

The Auditor Defendant also seeks dismissal of Lead Plaintiff's Section 11 claim on grounds that the CAC has not alleged facts sufficient to prove negligence.  (Docket No. 80 at 5:18-20.) However, Section 11 only requires a plaintiff to prove "(1) that

the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." <u>Rubke</u>, 551 F.3d at 1161 (internal quotation marks and citation omitted).  Section 11 generally holds "the issuer of the securities . . . absolutely liable." <u>Ernst & Ernst v. Hochfelder</u>, 425 U.S. 185, 208 (1976). However, experts, like the Auditor Defendant here, "who have prepared portions of the registration statement are accorded a 'due diligence' defense.  In effect, this is a negligence standard." <u>Id.</u>  The expert must prove it acted with due diligence.  <u>Id.</u> Accordingly, with respect to the Auditor Defendant, Lead Plaintiff "need not affirmatively plead negligence."  <u>In re Initial Pub. Offering Sec. Litig.</u>, 241 F. Supp. 2d 281, 396 (S.D.N.Y. 2003).[5] The Auditor Defendant only argues that the CAC does not allege negligence.  It fails, because it does not argue that the CAC alleges it acted reasonably, which would be required to establish

_____

[5]At oral argument, the parties discussed whether Lead Plaintiff had to plead that the Auditor Defendant and the Underwriter Defendants were negligent. Cases often state that non-issuer defendants will be liable for negligence. <u>See, e.g.</u>, <u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d 347, 359 (2d Cir. 2010).  However, this language indicates that a Section 11 claim against non-issuer defendants will ultimately come down to negligence, because these defendants may avoid liability if they prove they acted diligently.  Thus, the burden is not on Plaintiff to plead negligence.  A recent case from the Second Circuit is illustrative of this point.  After holding that non-issuers "may be held liable for mere negligence," the Second Circuit clarified in a footnote that:

> More specifically, section 11 provides several due diligence defenses available to non-issuer defendants, <u>see</u> 15 U.S.C. § 77k(b), and section 12(a)(2) contains a "reasonable care" defense, id. § 77l (a)(2). . . . Generally speaking, defendants bear the burden of demonstrating the applicability of each of these defenses, which are therefore unavailing as a means of defeating a motion to dismiss pursuant to Rule 12(b)(6).

<u>Id.</u> at 359, n.7.

an affirmative defense at the motion to dismiss stage.  <u>McCalden v.</u>
<u>California Library Ass'n</u>, 955 F.2d 1214, 1219 (9th Cir. 1990)
(holding that "[f]or a complaint to be dismissed because the
allegations give rise to an affirmative defense 'the defense
clearly must appear on the face of the pleading.'").

     The Underwriter Defendants assert that the face of the CAC
establishes their due diligence defense.  They argue that their
work on the offering and prospectus relied on the auditors'
financial statements and certified expert opinions, which they were
entitled to do, and which, thus, justifies their dismissal.  "An
underwriter need not conduct due diligence into the 'expertised'
parts of a prospectus, such as certified financial statements."  <u>In</u>
<u>re Software Toolworks Inc.</u>, 50 F.3d 615, 623 (9th Cir. 1994).  An
underwriter "need only show that it 'had no reasonable ground to
believe, and did not believe ... that the statements therein were
untrue or that there was an omission to state a material fact
required to be stated therein or necessary to make the statements
therein not misleading.'"  <u>Id.</u>  Although an underwriter must prove
the due diligence defense, courts look to plaintiffs to point to
red flags that should have indicated to the underwriter that the
financial statements were not trustworthy.  <u>See</u> <u>id.</u> at 623-24.

     While <u>In re Software Toolworks</u> was decided at the summary
judgment stage, in <u>In re Countrywide</u> a district court allowed a
defendant underwriter to establish the due diligence defense at the
motion to dismiss stage, because "underwriters may reasonably rely
on auditors' statements, absent red flags that the underwriters
were in a position to see."  588 F.Supp.2d at 1175.  At least one
unpublished decision in this district has disagreed with <u>In re</u>

                              18

Countrywide.  In re China Intelligent Lighting and Electronics, Inc. Sec. Litig., No. CV-112768-PSG (SSx), at * 11.  However, this court did not fully address the very basis of In re Countrywide's ruling: that underwriters occupy a special place in Section 11 jurisprudence because they are allowed to rely on auditors' work, absent red flags.  The Court here agrees with In re Countrywide.

The CAC is essentially silent about the underwriters, other than identifying them.  (CAC ¶¶ 23-26.)  Lead Plaintiff's opposition argues that various red flags should have alerted the Underwriter Defendants to the misleading statements in the Auditor Defendant's work.  Most notable among these are that the prior auditor, Grant Thornton, resigned.  However, nothing in the disclosure regarding Grant Thornton's resignation would have alerted the Underwriter Defendants to the Dajiang deal being fraudulent.  (See id. ¶ 47.)  Lead Plaintiff also suggests that the Auditor Defendant's production of an audit opinion in twenty-two days after Grant Thornton's resignation should have been a red flag.  However, nothing before the court shows that the audit was performed too quickly.  Such a determination would depend on how much information the auditors had to analyze, and how many auditors they devoted to the audit, among other factors.  However, the CAC does not allege sufficient information about these matters.  Moreover, the Auditor Defendant was Yuhe's auditor from March 12, 2008 until December 7, 2009, when Grant Thornton assumed that role.  (Id. ¶ 47.)  After Grant Thrornton's resignation three months later, the Auditor Defendant was reappointed.  (Id.)  Thus the emphasis on the twenty-two day time span is not particularly probative, because the Auditor Defendants were likely already

familiar with Yuhe.  The Section 11 claim against the Underwriter

Defendants is, therefore, dismissed without prejudice.

**C. The Section 12(a)(2) Claim**

The Underwriter Defendants ask this Court to dismiss Lead

Plaintiff's Section 12(a)(2) claim.  "Section 12(a)(2) provides for

civil liability of securities sellers to purchasers if the seller

used certain instruments, including a prospectus, containing untrue

statements or material omissions."  In re Levi, 527 F. Supp. at

980; 15 U.S.C. § 77l(a)(2).  Section 12 "permits suit against a

seller of a security by prospectus only by 'the person purchasing

such security from him,' thus specifying that a plaintiff must have

purchased the security directly from the issuer of the prospectus."

Hertzberg v. Dignity Partners, Inc., 191 F.3d 1076, 1081 (9th Cir.

1999)(quoting 15 U.S.C. § 77l (a)(2)).  A plaintiff who purchased

shares in the aftermarket will not have standing under Section 12,

even if he can trace those shares back to the relevant offering.

In re DDi Corp., 2005 WL 3090882, at *17 (C.D. Cal. July 21, 2005).

When plaintiffs purchase stock pursuant to an offering or a

prospectus, it means that they have purchased stock from its

issuer.  In re Levi Strauss, 527 F. Supp. 2d at 983; In re Nat'l

Golf Properties, Inc., 2003 WL 23018761, at *2.

Paragraphs 17, 139, and 146 make clear that Lead Plaintiff and

at least some class members purchased stock "pursuant to" the

offering and "pursuant" to the prospectus.  Accordingly, Lead

Plaintiff has stated a claim on behalf of itself and all class

members who purchased pursuant to the offering, and that is all

that is needed to survive a motion to dismiss.  See In re Levi

Strauss & Co. Sec. Litig., 527 F. Supp. at 983; In re Nat'l Golf

<u>Properties</u>, 2003 WL 23018761, at *2.  However, to the extent

members of the subclass hold shares that are only traceable to the

second offering, (<u>see</u> CAC ¶ 1), their claims are dismissed with

prejudice.  <u>In re DDi Corp.</u>, 2005 WL 3090882, at *17 (C.D. Cal.

July 21, 2005).

 **D. <u>Defendant Yuhe's Motion to Strike</u>**

 Yuhe has moved to strike paragraphs 2-4, 75-81, and 107 from

the CAC.  (Docket No. 83 at 5:23-25.)  Because these paragraphs

improperly rely on an outside report, Yuhe argues, they violate

Plaintiffs Rule 11 duty to conduct an independent investigation on

matters alleged in the complaint.  (<u>See generally</u> <u>id.</u> at  3:19-

5:25.)

 Portions of a CAC that do not comport with Rule 11's

independent investigation requirement may be stricken.  <u>See</u> <u>In re</u>

<u>Connetics Corp. Sec. Litig.</u>, 542 F. Supp. 2d 996, 1004-05 (N.D.

Cal. 2008); <u>Fraker v. Bayer Corp.</u>, No. CVF08-1564 AWI GSA, 2009 WL

5865687 (E.D. Cal. Oct. 6, 2009).  Under Rule 11(b), an attorney

who files pleadings with a court "certifies that to the best of the

person's knowledge, information, and belief, formed after an

inquiry reasonable under the circumstances: . . . the factual

contentions have evidentiary support or, if specifically so

identified, will likely have evidentiary support after a reasonable

opportunity for further investigation or discovery."  Fed. R. Civ.

P. 11(b).  Rule 11(b) recognizes a "nondelegable responsibility"

for an attorney to "personally ... validate the truth and legal

reasonableness of the papers filed," <u>Pavelic & LeFlore v. Marvel</u>

<u>Entm't Group</u>, 493 U.S. 120, 126 (1989), and "to conduct a

21

reasonable factual investigation," <u>Christian v. Mattel Inc.</u>, 286

F.3d 1118, 1127 (9th Cir. 2002).

Yuhe states that GeoInvesting was a short-seller "seeking to

benefit from the publication of negative information" about Yuhe,

and that reliance on the GeoInvesting Report is insufficient to

satisfy Rule 11(b)'s independent investigation requirement.

(Docket No. 119 at 1:20-22, 2:7-9.)   Lead Plaintiff, however,

states that multiple sources informed their allegations in the

challenged portions of the CAC.   Lead Plaintiff states:

> The paragraphs Yuhe seeks to strike, on Rule 11
> grounds no less, contain facts obtained from a Form
> 8-K Yuhe filed on June 20, 2011 attaching its June 14,
> 2011 press release, including five documents Yuhe
> disseminated to investors in support of its purported
> purchase of Dajiang's thirteen breeder farms (¶79);
> excerpts from four publicly-available transcripts of
> telephone calls wherein the Chairman of Dajiang
> repeatedly denies [to a GeoInvestiang investigator]
> that it sold its breeder farms to Yuhe and never
> received any money from it (¶¶76, 77, 78, and 81); and
> an investigatory report by GeoInvesting LLC (¶¶2, 75)
> along with a few website postings regarding its
> participation in an investor conference call with Yuhe
> (¶¶3, 4, 80).

(Docket No. 112 at 1:11-20.)   Since Yuhe does not respond to

Plaintiff's argument, they have conceded it.   Cent. Dist. L.R. 7-

12; <u>See also</u> <u>Fiqueroa v. Baja Fresh Westlake Vill., Inc.</u>, CV 12-

769-GHK SPX, 2012 WL 2373254, at *2 (C.D. Cal. May 24, 2012);

<u>Richter v. Mut. of Omaha Ins. Co.</u>, CV 05-498 ABC, 2007 WL 6723708,

at *5 (C.D. Cal. Feb. 1, 2007) <u>aff'd</u>, 286 F. App'x 427 (9th Cir.

2008); <u>Westerfield v. Wade</u>, No. CV05-6645 ABCCWX, 2006 WL 5668264,

at *4 (C.D. Cal. Oct. 4, 2006).

This leaves some paragraphs where the GeoInvesting report,

supplemented by Lead Plaintiff's attorney's "multiple"

conversations with GeoInvesting about the "basis for its

investigatory report and its communications with Mr. Zheng," is the

only source.   (Markert Decl. ¶ 113, Docket No. 113.)   The Yuhe

Defendants argue that the GeoInvesting Report is not reliable, and

their principle case for the point is Zucco Partners, LLC v.

Digimarc Corp., 552 F.3d 981, 995 (9th Cir. 2009).   But the portion

of Zucco they cite deals with the appropriate way for a court to

analyze a pleadings that rely on a confidential witness.   Id.   In

the present case, the Yuhe Defendants do not argue, nor could they,

that the GeoInvesting report is a confidential source.   While the

Yuhe Defendants argue that the GeoInvesting report is not credible,

because, among other reasons, GeoInvesting was a short seller with

an interest in diminishing Yuhe's stock value, the effects

GeoInvesting's motive is "a factual dispute not appropriate for

resolution at this stage."   See In re China Educ. Alliance, Inc.

Sec. Litig., No. CV 10-9239 CAS JCX, 2011 WL 4978483, at *4 (C.D.

Cal. Oct. 11, 2011) (refusing to analyze motives of a short seller)

(quoting Henning v. Orient Paper Inc ., No. CV 10-5887 VBF, 2011 WL

2909322, at *4 (C.D.Cal. Jul.20, 2011).

     The Yuhe Defendants seek to distinguish In re China Educ. by

arguing that in the instant case particular facts in the

GeoInvesting report suggest that it is unreliable.   Particularly,

the Yuhe Defendants note that: GeoInvesting gathered its

information in part by speaking to an individual, Mr. Zheng, under

false pretenses, and, further, that Mr. Zheng gave contradicting

statements at one point as to whether Yuhe ever talked with Dajiang

about acquiring farms.   However, just because GeoInvesting

allegedly used false pretenses to speak with Zheng, does not mean

it did not learn the truth from him.   Additionally, it is not clear

23

Zheng gave contradictory statements.  Although he first denied that negotiations happened, when he later stated they did occur, he said the negotiation was for a "fake deal."  (CAC ¶ 78.)  Zheng's statements could be seen as consistent, as a negotiations for a fake deal might be considered as a non-negotiation.  Any further analysis into the "truth" of the GeoInvesting report would be inappropriate, because doing so would implicate a factual dispute that should not be decided at this stage.  See Henning, 2011 WL 2909322, at *4.

Accordingly, the Yuhe Defendants' motion to strike is DENIED.

## IV. Conclusion

For the reasons stated, the Court DENIES the Defendants' motions, with the exception of GRANTING dismissal of the Section 11 claim against the Underwriter Defendants, GRANTING Dismissal of the Section 10(b) claim against Gang, and GRANTING dismissal of the Section 12(a)(2) and Section 11 claims of all subclass members whose Yuhe shares are only traceable to the second offering. Dismissal is without prejudice, except as to the Section 12(a)(2) claims.

IT IS SO ORDERED.

Dated: March 5, 2013

DEAN D. PREGERSON
United States District Judge